**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

PREMIER SIGNATURE
RENOVATIONS, LLC, et al.,

         **Plaintiffs,**               **Case No. 1:25-cv-494**

         **v.**                       **JUDGE DOUGLAS R. COLE**

LOAN DEPOT, INC., et al.,

         **Defendants.**

## <u>OPINION AND ORDER</u>

Defendant Wright Patt Credit Union moves to dismiss Plaintiffs' claims in this matter under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Court **GRANTS** Wright Patt's Motion to Dismiss (Doc. 24).

## BACKGROUND

Plaintiffs Jason Kreusch and Premier Signature Renovations, LLC, filed their Complaint (Doc. 1) on July 16, 2025, and filed an Amended Complaint (Doc. 6) shortly thereafter. The dispute stems from a construction project that Plaintiffs—a contracting company and its owner, (*see* Doc. 6, #28, 31)—undertook on an investment property owned by certain of the Defendants, (*id.* at #28). Specifically, Defendants Karan Motiani and Mary Kathryn Lash (who are allegedly members of Defendant Molano Properties, LLC)[1] hired Plaintiffs to "rehab" a residential investment property located at 1230 Myrtle Avenue, in Cincinnati, Ohio. (*Id.*).

---

[1] The Court refers to Motiani, Lash, and Molano Properties, LLC, collectively as "Molano."

Plaintiffs entered into an agreement with Molano in late July 2019. (*Id.*). And on July 31, 2019, Molano closed on a construction loan from Defendant Loan Depot, Inc., to finance the project. (*Id.* at #28–29). It turns out, though, that this loan was not in keeping with Plaintiffs' expectations. Molano allegedly represented the loan to Plaintiffs as a so-called "homestyle loan." (*Id.* at #29). In reality, Defendants, unbeknownst to Plaintiffs, took out a "203(k) loan," which, Plaintiffs say, wrongfully "removed" them "from the function(s) associated with a general contractor, including control over job costs and the typical 'draw' process." (*Id.*).

Plaintiffs commenced work in August 2019, but did not receive any funds from Loan Depot until the end of September or early October. (*Id.*). And when that first payment came through, it was $8,000 short. (*Id.*). Plaintiffs allege that this is because the "[t]hen inspector, Larry Davidson, falsely claimed … that the work was not complete, and that he could not sign off on it." (*Id.*). But, according to Plaintiffs, Davidson himself "submitted photographs with evidence that the work had, in fact, been completed." (*Id.*). The alleged "falsehood," which "was perpetuated by all Defendants to Plaintiff[s'] detriment," "pushed … Plaintiff[s] behind in receiving further payments from the lender." (*Id.*).

But that's not all. Once Plaintiffs started the job, they discovered that the project required extra work not contemplated by the parties' original agreement. (*Id.*). This included, for example, "repair and replacement of joists," "extra can-lights" that Molano ordered, and "other structural issues such as bathroom/kitchen floors, and the reframing of a new wall in the downstairs bathroom due to water damage." (*Id.*).

2

Plaintiffs asked Davidson, the inspector, to submit these extra items to the lender so that they could be paid for "out of the contingency fund," but to no avail. (*Id.*). Davidson informed Plaintiffs that no money remained in that fund because "[Molano] had to purchase a new furnace." (*Id.*).

That Molano was purchasing a new furnace for the property was news to Plaintiffs. (*Id.*). Indeed, when Plaintiffs submitted their proposal for the renovation work, they "included a price for a new HVAC system." (*Id.*) But Molano asked Plaintiffs to remove that item because they intended to keep the HVAC system that was already installed at the property. (*Id.*). In any event, the new and unforeseen HVAC system installation required Plaintiffs to complete unanticipated work on the property—namely, drywall and ceiling work to accommodate the new system's ductwork and electrical requirements. (*Id.* at #30). Once the ducts and wiring were in place, a company called "Isabella Painters" replaced the drywall, and Plaintiffs painted the walls. (*Id.*). Plaintiffs allege that none of this was contemplated by the contract. Under the parties' agreement, painting services were to be furnished by a "painting contractor," not Plaintiffs. (*Id.*). Additionally, Plaintiffs say that Molano failed to pay Isabella Painters, which led to the company filing a mechanic's lien on the property and subsequent litigation (although that litigation has since ended). (*Id.*).

Other issues arose in connection with the additional can-lights noted above, which Molano purchased despite the parties having already agreed to the submitted price for electrical contracting. (*Id.*). While the Amended Complaint's allegations on

3

this front are not a model of clarity, it appears that Molano somehow "pressured" Plaintiffs into paying the full amount of the electrical subcontractor's bill after Plaintiffs already paid 60% of the total balance owed. (*Id.*). Additionally, the electrician allegedly "illegally altered documents." (*Id.*). Finally, the electrician (along with the HVAC contractor) allegedly failed an inspection, thus delaying Isabella Painters' work for about a month. (*Id.*).

Finally, a dispute regarding the project's deadline cropped up as the project neared completion. Under the parties' agreement, Plaintiffs had until January 31, 2020, to complete the work. (*Id.* at #31). Yet Molano insisted that Plaintiffs complete the job a month earlier, by December 31, 2019. (*Id.*). And when Plaintiffs responded that they could not guarantee completion by that date, Molano "threatened Plaintiffs with fines and other consequences." (*Id.*). Loan Depot then "put a halt to the project" until the parties resolved the issue. (*Id.*). As a result of the dispute, the work environment became "extremely hostile." (*Id.*). Not long after, Molano had new contractors at the property, "thereby effectively terminating Plaintiff[s'] agreement, making contractual fulfillment an impossibility." (*Id.*).

Looking to resolve the matter, Molano contacted Plaintiffs and told them that Molano had found an "arbitrator," whom they represented as the "CEO of a construction company that does multimillion-dollar contracts." (*Id.*). Based on that representation, Plaintiffs agreed to arbitrate their differences. But Plaintiffs later discovered that Molano's "arbitrator," Philip Lash, was not, in fact, the CEO of a construction company. (*Id.*). More importantly, Plaintiffs discovered that Lash is

related to Defendant Lash, which, Plaintiffs say, gave rise to a "clear biased conflict of interest and misrepresentation." (*Id.*).

Although the Amended Complaint does not specify how, these events also led to Plaintiff Kreusch's arrest. (*Id.* at #35). He was charged criminally, but those charges were later dismissed pursuant to an agreement with the state. (*Id.*). As part of its investigation, the state apparently requested information about Plaintiffs from Defendant Wright Patt Credit Union, to which Plaintiffs belong. (*See id.* at #31–32). On Plaintiffs' telling, Wright Patt's compliance with that request (which appears to have taken the form of a grand jury subpoena[2]) "allowed or facilitated the wrongful dissemination of Plaintiff's bank records for a governmental investigation without Plaintiff's knowledge, notice, ability to protest or object, and upon information and belief, without a subpoena or other legal process." (*Id.* at #32).

Based on these allegations, Plaintiffs assert five counts against all Defendants: (1) breach of contract, (2) fraud and conspiracy, (3) a count for punitive and statutory damages, (4) malicious prosecution/abuse of process, and (5) frivolous conduct. (*Id.* at #32–36).[3]

---

[2] While Plaintiffs' Amended Complaint alleges on information and belief that Wright Patt disclosed Plaintiffs' information "without a subpoena or other legal process," (Doc. 6, #32), Plaintiffs' Response acknowledges that the request took the form of a subpoena, (*see* Doc. 41, #204–05).

[3] Plaintiffs' Complaint also (1) references the "Gram[m]-Leach-Bliley Act," (Doc. 6, #32), (2) cites 12 U.S.C. § 3403 and 12 C.F.R. Part 261, (*id.*), and (3) refers to (but does not specifically cite) "other Federal Rules and Regulations," (*id.*). These references appear in the Amended Complaint's fact section, not the portion that lays out Plaintiffs' claims for relief. (*Id.* at #32–36). Additionally, Plaintiffs identify no private right of action that gives them a right to sue based on these sources. As such, the Court declines to consider these allegations

Wright Patt's Motion to Dismiss (Doc. 24) contends that each of these theories fail as alleged against Wright Patt. While Wright Patt addresses each count separately, its arguments as to each share a common refrain: that Plaintiffs allege essentially no facts giving rise to a plausible inference that Wright Patt's conduct violated the law. (Doc. 24, #108–13). Plaintiffs' Response (Doc. 45) contests that assertion, but in a rather conclusory fashion. Plaintiffs assert, with no analysis, that they have "alleged sufficient facts to support each element of the claims asserted." (Doc. 45, #217). Plaintiffs also say that their allegations against Wright Patt are sufficient to meet Federal Rule of Civil Procedure 8(a)'s requirement of a "short and plain statement of the claim." (*Id.*). Finally, Plaintiffs say that, if the Court deems "any portion of the Complaint deficient," they should be permitted leave to amend. (*Id.*).

With the benefit of Wright Patt's Reply (Doc. 49), the matter is ripe for review.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "sufficient factual matter … to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). While a "plausible" claim for relief does not require a showing of probable liability, it requires "more than a sheer possibility

---

as a separate "claim." At the motion to dismiss stage, "a formulaic recitation of the elements of a cause of action" won't do. *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citation omitted). By extension, mere references to tangentially related provisions of federal law are not sufficient either.

that a defendant has acted unlawfully." *Id.* The complaint must allege sufficient facts to allow the Court "to draw the reasonable inference that the defendant is liable." *Id.*

"In reviewing a motion to dismiss, [the Court] construe[s] the complaint in the light most favorable to the plaintiff, draw[s] all reasonable inferences in [his] favor, and accept[s] all well-pleaded allegations in the complaint as true." *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir. 2021). But that does not mean the Court must take everything a plaintiff alleges at face value, no matter how unsupported. The Court may disregard "naked assertion[s]" of fact, "formulaic recitation[s] of the elements of a cause of action," and "mere conclusory statements." *Iqbal*, 556 U.S. at 678 (cleaned up). Additionally, the Court may grant a motion to dismiss "on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989) (citations omitted).

## LAW AND ANALYSIS

The Court starts with Plaintiffs' fraud and conspiracy claims. (Doc. 6, #33–34). To state a claim for fraud under Ohio law, a Plaintiff must allege:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Gaines v. Preterm-Cleveland, Inc.*, 514 N.E.2d 709, 712 (Ohio 1987) (citations omitted). To plead civil conspiracy, a plaintiff must allege "a malicious combination of two or more persons to injure another person or property, in a way not competent

for one alone, resulting in actual damages." *Addison Holdings, LLC v. Fox, Byrd & Co., P.C.*, 203 N.E.3d 1259, 1285 (Ohio Ct. App. 2022) (citations omitted). "Ohio law does not recognize civil conspiracy as an independent cause of action," and "to prevail on a civil conspiracy claim, a plaintiff must demonstrate the existence of an underlying unlawful act." *Id.* (citations omitted).

Under Federal Rule of Civil Procedure 9(b), a party "alleging fraud or mistake" must "state with particularity the circumstances constituting fraud or mistake." To comply with Rule 9(b), "Plaintiffs' complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Data Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (internal quotation marks omitted) (quoting *Gupta v. Terra Nitrogen Corp.*, 10 F. Supp. 2d 879, 883 (N.D. Ohio 1998)). Moreover, under Rule 9(b), "*each* defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged." *United States v. Doyle*, No. 1:18-cv-373, 2022 WL 1186182, at *5 (S.D. Ohio Apr. 21, 2022) (citations omitted). In other words, Rule 9(b) forbids the practice of "group pleading." *Id.*

Plaintiffs' allegations against Wright Patt come nowhere close to meeting this standard. Plaintiffs' conclusory allegation that Wright Patt "allowed or facilitated the wrongful dissemination of Plaintiff's bank records without Plaintiff[s'] knowledge" does not address any of the who/what/where questions to which Rule 9(b) requires an answer. (Doc. 6, #32). Nor does the Amended Complaint explain why Wright Patt's

8

actions were fraudulent.[4] Because the Amended Complaint's allegations against Wright Patt do not satisfy the requirements of Rule 9(b), the fraud claim must be dismissed. And because the civil conspiracy claim is parasitic on the fraud claim, *see Addison Holdings*, 203 N.E.3d at 1285, the civil conspiracy claim also fails.

Next, consider Plaintiffs' malicious prosecution and abuse of process claims. "The essential elements of a malicious criminal prosecution are (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the criminal defendant." *Trussell v. GMC*, 559 N.E.2d 732, 735 (Ohio 1990). And to state a claim for abuse of process, a plaintiff must allege "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damages has resulted from the wrongful use of process." *Voyticky v. Vill. of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005) (quoting *Yaklevich v. Kemp, Schaeffer, & Rowe Co.*, 626 N.E.2d 115, 116 (Ohio 1994)). While Plaintiffs' Amended Complaint seems to conflate these two theories of liability, they are, in fact, different. "The key consideration in a malicious … prosecution action is whether probable cause

---

[4] Admittedly, Plaintiffs provide a bit more information as to the allegedly fraudulent nature of Wright Patt's conduct in an affidavit from Plaintiff Kreusch attached to Plaintiffs' Response. (*See* Doc. 41-1, #207–08). Nothing that Kreusch says, though, actually gives rise to a plausible inference of fraud. And, at any rate, the Court does not consider the affidavit in this ruling, as doing so would convert Wright Patt's motion to dismiss into a motion for summary judgment—a path that the Court declines to take at this juncture. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

was initially present to bring a previous suit, while the key consideration in an abuse of process action is whether an improper purpose was sought to be achieved by the use of a lawfully brought previous action." *Hershey v. Edelman*, 932 N.E.2d 386, 394 (Ohio Ct. App. 2010) (citation omitted).

But either way, the claims fail. Again, the sole allegation against Wright Patt is that it complied with what appears to be a grand jury subpoena. (*See* Doc. 6, #32–33; Doc. 24, #109). In doing so, Wright Patt did not, in any way, "institut[e]" a malicious prosecution. *Trussell*, 559 N.E.2d at 735. Nor did it seek the "improper purpose" that is the essence of an abuse of process claim. *Hershey*, 932 N.E.2d at 394. In their Response, Plaintiffs "suggest[] that the basis for the release [of Plaintiffs' information] is/was bogus and perhaps the result of Fraud." (Doc. 41, #204; *see also id.* at #205 ("[Wright Patt] may have participated in this by the release of bank records, which were based on suspect, if not fraudulent subpoenas and false pretenses.")). And Plaintiffs suggest that they are entitled to discovery to "investigate what has been raised herein." (*Id.* at #204). That, however, gets things backwards. In civil litigation, legally adequate allegations come first, and discovery comes after. *Cf. Iqbal*, 556 U.S. at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). Because Plaintiffs' Complaint does not allege *facts* that give rise to a plausible inference that Wright Patt committed any wrongdoing by cooperating with the state's investigation,

10

their malicious prosecution and abuse of process claims do not "unlock the doors of discovery." *Id.*

Next up is Plaintiffs' claim for "frivolous conduct" under Ohio Revised Code § 2323.51. That provision, though, "is not an independent cause of action that can be brought in a separate civil lawsuit." *Luchansky v. Jagnow*, No. 97-ca-191, 1998 WL 635871, at *4 (Ohio Ct. App. Sep. 11, 1998). Instead, it "is simply a way for the court to impose sanctions upon litigants for frivolous conduct." *Id.* So this claim fails on a "dispositive issue of law." *Neitzke*, 490 U.S. at 326 (citations omitted).

Finally, the Court considers Plaintiffs' breach of contract claim. "Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012). Once again, the paucity of concrete factual allegations against Wright Patt dooms this claim. As Wright Patt points out, "Plaintiffs fail to identify their contract with [Wright Patt], or any allegations as to how [Wright Patt] breached it." (Doc. 24, #108). And while Wright Patt itself notes that its relationship with customers is "governed by a contract," it represents, with no pushback from Plaintiffs, that the contract's confidentiality terms permit Wright Patt to "share a customer's personal information to 'respond to court orders and legal investigations.'" (*Id.*). So Plaintiffs fail to adequately allege either the existence of a contract or its breach. And to the extent that a contract exists between Plaintiffs and Wright Patt,

11

it seems to authorize, rather than prohibit, the conduct in which Wright Patt is alleged to have engaged.

That leaves one final piece of housekeeping.[5] Plaintiffs suggest that if the Court deems their pleading "deficient," it should give them leave to amend under Federal Rule of Civil Procedure 15. (Doc. 41, #205). The Court declines to do so. For most, if not all, of the claims, the Court sees little reason to believe that Plaintiffs could cure the deficiencies through amendment. Even if they could, there is little reason to include in this action the claims against Wright Patt, which seem vastly different from the claims against the other Defendants, especially as the remaining Defendants have agreed to arbitrate their dispute. But, as Plaintiffs have requested an opportunity to cure, the Court will dismiss Wright Patt from this action without prejudice, so that Plaintiffs can file a new action against it if they believe they can meet the pleading requirements for their claims.

## CONCLUSION

For the reasons stated, the Court **GRANTS** Wright Patt's Motion to Dismiss (Doc. 24) and **DISMISSES** Wright Patt from this action **WITHOUT PREJUDICE**. Consistent with that, the Court **DIRECTS** the Clerk to terminate Defendant Wright Patt Credit Union as a Defendant in this action.

---

[5] The Court does not separately address Plaintiffs' punitive and statutory damages claim. (*See* Doc. 6, #34–35). A plaintiff's entitlement to punitive damages is derivative from a substantive cause of action. *Graham v. Am. Cyanamid Co.*, Nos. C-2-94-423, C-2-94-425, 2000 WL 1911431, at *12 (S.D. Ohio Dec. 21, 2000) (quoting *Bishop v. Grdina*, 485 N.E.2d 704, 705 (1985)) ("The Ohio Supreme Court has held that 'no civil cause of action may be maintained simply for punitive damages.").

**SO ORDERED.**


April 22, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

13